Your argument now in the case of Brown v. Jones. Mr. Perkins. Thank you, Your Honor, and may it please the Court. At jury selection for Mr. Brown's 2009 murder trial in Champaign, the only African-American prospective juror out of the 31 jurors examined was seated in the first panel of four. This meant that a single peremptory strike at the outset of jury selection was capable of effectively removing all African-Americans from the jury pool. Indeed, at its earliest opportunity and without asking a single question, the prosecution immediately struck that potential juror, Mr. Devenware. In contrast, that same prosecutor went on that day and the next to ask non-African-American potential jurors as many as 15, 16, or even 20 questions about themselves. There was preceded by the judge asking questions of the jurors, though, right? That's correct. The judge walked through what seemed to be a standard series of screening questions, including one about the American Legion and other subjects, and then turned over to prosecutors in the defense for examination. And what we learned from the fact that the prosecutor didn't ask any further questions here, we know that from this record, when this prosecutor did care about potential sources of juror bias, her approach was exhaustive. In fact, the prosecution used only one other peremptory challenge after asking that juror 11 questions. When defense counsel presented a detailed Batson challenge, the state trial judge rejected it out of hand without an explanation. The Illinois Appellate Court later affirmed that judgment on the basis of a single circumstance rather than the totality of the circumstances. And to this day, nearly 11 years after trial, no reason has ever been given for striking Mr. Devenware. This was an unreasonable application of Supreme Court precedent under AEDPA in at least two important and distinct ways. First, Batson requires a judgment to be based on the totality of the circumstances. Even those factors specifically highlighted in Batson itself and present on the face of the transcript here give rise to a suspicion of discrimination. The most important factors are these. One, the prosecution's exclusion of Mr. Ware ensured that no African Americans would serve on Mr. Brown's jury. Two, the prosecution's selective peremptory strikes disproportionately worked to remove African Americans from the jury pool. And three, this prosecutor inexplicably deviated from her consistent practice of detailed questioning when it was Mr. Ware's turn to answer her question. Counsel, in that court, were the names of the respective jurors given to you prior to the examination, prior to the court time? Well, we know from the record that there were questionnaires that were given to jurors and they had information on them and that counsel was given them. And counsel in questioning referred to juror occupations, for example, numerous times. And so, they did come in with knowledge, some knowledge of what the jury pool is going to look like in terms of names and occupations, and they used that as the basis for a lot of their questions. So, I don't know. How many were jurors? I'm sorry. Say, go ahead. It's not clear whether or not those questionnaires had... How many were... I'm sorry. How many were called in? It's about... As I recall, it was about 60, wasn't it? That's right. That's right, Your Honor. So, it was... There were two black people in that 60, and one of them never did reach any further than just being in the whole black. Okay, go ahead. That's all correct, Your Honor. Yeah, it was a veneer of 60. About 31 were answered questions, were asked questions by the court. They were actually examined. And then of those, there was only one African-American of those 31, but there were two... My question, counsel, I didn't quite understand. Did you have the names or did they have the names prior to trial of the jurors? They did have those questionnaires, but we don't actually know what was on the questionnaires because they're not part of the record here. So, we don't know for sure exactly what they knew. But there was obviously prior knowledge because there was questionnaires passed out. I'm not sure if it was that day or any time before that. Sure. Thank you. So, going back to our Batson argument, had the appellate court properly considered totality of circumstances here, it would have been forced to conclude that Mr. Brown established a prima facie case of discrimination, and if it actually went through that analysis. That is what the appellate court failed to do under Batson. But second and equally problematic is what the appellate court did instead. Without evidence, it hypothesized a non-discriminatory rationale for the prosecutor. In so doing, and despite having the case cited to it, the appellate court directly contravened Johnson versus California. This court's cases in Franklin versus Sims, in United States versus Stevens, make clear that judicial speculation, even plausible speculation about the prosecution's reasons did not survive Johnson. Under this . . . Counsel, forgive me, but another issue on the questionnaires, did the questionnaires have a race question, in other words, where the race of the individual filling out the questionnaire was indicated? Unfortunately, we don't know for sure. What we do know from the record is what defense counsel said about the demographics of the veneer, the 2 out of 60 and 1 out of 31 issue. We did the work to figure out how many jurors were actually examined. So that, that number's in our, in a footnote in our brief. But . . . Well, how do we know the race? How did we know the race of the least of the people were called? We know that from, from defense counsel's detailed Batson challenge, and you can look at pages 9 to 16 of our blue brief for all that information. We know that he identified that there were two African-Americans in the veneer and Mr. Batson was one of those two. And there's no other mention of any other jurors by name and . . . My question is how you learned, how they learned that? Well, they were also there in person. We don't know if, if the veneer was, the rest of the veneer was seated behind . And your determination of races was a little bit skeptical. . . . . . . . . . . . . . . . . mr Bertrand's okay Well seemed no further questions. I'd like to reserve the reinger my time for rebuttal. Certainly, Mr. perks. Mr Fischer Morning honors counselor may please the court system Attorney General Garci is fisher for the respondent? Your honors petitioner is correct Question here is whether the totality of the circumstances around VW R dear provide evidence of discriminatory a primer facial case of discriminatory intent, but contrary to his position, the totality of the facts about for a deer in this case provide no evidence of a discriminatory purpose other than the fact that the state happens to exercise one peremptory challenge against an African American veneer person. Petitioner conceded in the state court that he could identify no pattern to the state's use of peremptory challenges here. Indeed, the state only used two peremptory challenges, one against an African American veneer person and one against a white veneer person. And while it is true that that meant that he had used 50% of his peremptory challenges against African American veneer persons, this court has held in similar cases where we have a very low statistical number of peremptory challenges in African American veneer people that that alone is not sufficient to establish prime facial evidence of discriminatory intent. Um, the record does not indicate why the second African American man didn't end up on the jury. He, uh, but we do know from the record that the state did not use a peremptory challenge to exclude him. And while this did produce an all white jury, it can't be said that African Americans were proportionally underrepresented on the jury because only 3% of the veneer was African American. There is no fair cross section challenge raised here. Um, 3% is low, but in a county like Champaign, um, there's only 10% African American. It's not so low that you wouldn't expect to see it just as a matter of statistics once every 10 to 20 cases. Um, so statistically speaking, there's not enough to establish prima facie evidence of discriminatory purpose to the state's use of a peremptory challenge against where, um, so the prosecutor used this strike without asking additional questions after the judges questioning. Um, but, of course, as petitioners own reply brief points out, defense counsel did the exact same thing in one instance, striking, uh, of a near person using a peremptory challenge without asking any additional questions. Sometimes counsel knows after the judges questions or even after the questionnaire that this is just not someone they want on their jury. And when it comes to peremptory challenges, uh, counsel can use those for any non discriminatory purpose. Um, if they decide that this is just not someone that they want on their jury. Um, so petitioner points to counsel's silence here. Um, but where's answers to the judges questions? Belie any inference of discrimination that could be drawn from that silence because where was the only veneer person who had been to the scene of the crime? Um, and, uh, petitioner points to another juror who said she was familiar with the American Legion Hall. But unlike where she hadn't been in the parking lot where the murder occurred. And so in the only way that really matters from the judges questioning, she doesn't actually provide a comparator juror at all, nor is it telling that where testified that he could be that's true in practically every case involving peremptory challenges. If he hadn't testified that he could be impartially would have been struck for cause. Um, so no inference can be drawn from where testimony that he could be impartial regarding discriminatory purpose. Um, and contrary to petitioner's position, consideration of, uh, the judge's questions and where's responses in this case are relevant to the totality of circumstances at the first stage of Batson and don't improperly collapse the Batson analysis. Um, contrary to Johnson. Um, first, this court has held that even after Johnson, where a non discriminatory reason for exercising peremptory challenges so apparent from the record that it belies any inference of discriminatory intent, it's still relevant at the first stage. Um, and somehow provides evidence of discriminatory intent. Um, it is relevant, uh, to that analysis. Then to ask the question, what were the other circumstances around him exercising a strike without asking additional questions? Um, so I could I just a second as far as, uh, what we're new. When I when I look at this first time, it looks like he knew where the whatever it was. American Legion. All your honor. Pardon? An American. Yeah, but he knew where it was. I didn't notice where he went into the parking lot and did something else. He had, um, he had been to the exterior. I'm sorry, Your Honor. I missed the last part. I know this is awkward. He drove by and knew where it was. Nobody else there seemed to know where it was. I believe, Your Honor. He testified that he had been to the exterior of the American Legion Hall, and the shooting happens as, um, as the victim in the parking lot, right? Yes, Your Honor. As the victims are exiting the building into the parking lot is where the shooting occurs. No, but he had been this had been in the parking lot. Mr Where? I believe that's consistent with his testimony of our dear, Your Honor. Um, thanks. That's all right. Go ahead. Uh, well, Your Honor. In some, the totality of the circumstances around voir dire don't provide enough evidence of discriminatory intent for petitioner to satisfy his burden of showing a prima facie case that the um, and it certainly wasn't objectively unreasonable for the state court to come to that same conclusion. Um, if the court disagrees with that analysis, the proper remedy here would be to remand for an evidentiary hearing on the bats and claim. Um, petitioner argues that this court should go ahead and order a new trial, granting habeas relief. Um, but, of course, even if the court were to find that the state court's decision was an unreasonable application of bats and are contrary to Johnson, it still can only grant habeas relief after finding an actual constitutional violation. Um, and the court has always given the state the opportunity when it does so in a case that was where the challenge was rejected at the first stage to continue bats and proceedings with second and third stage analysis. Um, and it petitioner is sort of asking to have it both ways here, arguing that would be contrary to Johnson to consider where's responses to the judge's questions about its familiarity with the American Legion Hall at the first stage, but arguing that the state doesn't get the opportunity to raise this, um, apparent basis for the peremptory challenge, uh, in further proceedings. Um, so again, in some, there's not evidence in the totality of the circumstances surrounding Vardir to establish prima facie evidence of discriminatory intent. Um, and to the extent the court disagrees, the proper remedy here would be remand for an evidentiary hearing on the bats and claim unless your honors have any further questions. Respondent asked that this court affirmed the district court's denial of the habeas petition. Thank you, your honors. Thank you, Mr Fisher. Mr Perkins. Anything further? Yes, your honor. To respond to a few things. First of all, the parking lot issue. Uh, that is actually a very good example of why there was a Johnson problem in this case. What Mr Ware actually said at Vardir was that he had been on the outside, not inside of the American Legion. That's it. He was not asked any further questions. There was no further development of that issue. If you look at page 16 of our brief that reprints the trial court's ruling after trial in the Batson challenge, that's the first notion. That's where it comes in here. That's the first introduction of the idea that he was in the parking lot. All that we know he was that he had been on the outside and not inside. And the judge, perhaps familiar with the circumstances that you discussed about where the crime occurred, the judge interjected that in the proceedings. We know from this court's cases in Franklin and in the bad explanation has to be so persuasive that there is no suspicion left of discrimination. But importantly, and as we point out in our reply brief, that doesn't fully explain the issue. It doesn't fully explain why the prosecution would necessarily be worried about him because there's no way to know which side he would have favored if we have no idea what his actual knowledge was of the American Legion that needed to still be explored. And on that point, the Supreme Court has been very clear in flowers, quoting the Miller L cases that a state's failure to engage in any meaningful void your examination on a subject the state alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination. That answers that question wrong. The Supreme Court's comparative juror analysis would not make sense unless we looked at all the questions that were asked to all different jurors. And that's also one reason why we bring up your West as well as jurors Gomez and others were questions. Also, the Supreme Court has also mentioned in United States versus Armstrong case that we do care about the background composition of the veneer. We care whether the veneers primarily consisting of African Americans or non African Americans. That is an important factor in this case. It can be taken out of this case. The Supreme Court's case in flowers went through all of the different circumstances of that trial. So that's why I asked the question of how you knew. And it's based on a visual observation of the jurors, right? Whether people are black or not, it was based on what defense counsel knew about the case. And as you're pointing out it, we don't exactly know what it was. But the trial judge didn't dispute those facts. It didn't say that that's wrong or there's something wrong about it. Unfortunately, we don't have it in the record exactly what the racial composition of the total veneer was. But we do know two African Americans and 58 non African Americans, one African American examined, 30 non African Americans examined. And to conclude, to talk about the remedy in this case, if we were to reach that point, we rely on our argument, our brief that we think Snyder versus Louisiana is the best guide here. We understand that this court, especially in the Hooper case, has remained for further fact finding. We do ask, though, that the court take a very close look at the Ninth Circuit cases of Paulino versus Harrison and United States versus Alcantar. There's an underlying question as to whether or not hearing would actually be useful here. And we need to have that question answered, at least by the district court. And to conclude, seeing no further questions, Mr. Brown respectfully requests that this court reverse the judgment of district court and remain with instructions to grant the writ. Thank you. Thank you, Mr. Perkins. The court appreciates your willingness and that of your law firm to accept the appointment in this case and your assistance to the court as well as to your client. Thank you very much.